The next matter on our calendar is Sharon Campbell v. National Fuel Gas. Thank you. Good morning. Good morning. May it please the Court, Harvey Sanders representing Sharon Campbell. The Court below found that there was a prima facie case and a legitimate non-discriminatory reason, and neither side challenges that. This case really turns on the question of pretext in this Title VII sex discrimination case. There are three errors below. One, the Court's decision on the cat's paw issue. Two, the Court's decision on the similarly situated question. And three, on the quantum of evidence that was offered as it related to the pretext argument in whole. With respect to the cat's paw argument, the District Court concluded that Mr. Ramsdale made the decision based on a recommendation from Mr. Richards and that Mr. Jandro did not make a specific recommendation and therefore the decision makers were not . . . That's my position. And while the Court below said that there was an independent investigation, the only investigation was to review the Jandro report and the documents that Mr. Jandro submitted. So there really was no independent investigation. And Mr. Jandro did not report to his higher-ups about the fact that it was a routine practice within that department for employees to not necessarily directly correspond their actual time in the field to the time in their reports. So the fact that that information wasn't presented to the decision makers deprived them of information that would have been important to them in making that decision. So Mr. Jandro, we contend, is ultimately the person behind why this decision was made. And the fact is that he selectively enforced the policy. There's no question. There's evidence in the record that employees, when they were out in the field, did their work but might enhance the description of the work that they were doing in order to make themselves . . . And they were all men? So it's our position that those individuals were not similarly situated because those individuals did not report to Mr. Jandro. When we look at the individuals that reported to Mr. Jandro, there really, we contend, only two employees that were similarly situated. But it does show that there's a policy with regard to dismissing people for . . . I think that's right. So . . . There is a policy for it, but . . . What does that say to pretext? Well, I think what it says is that when things are escalated to the point of HR and higher ups in administration, they're going to terminate under that policy. As it was in practice in the field, however, lots of this conduct occurred without ever getting reported, and lots of those other people, and particularly the people in Mr. Jandro's department, if you will, got away with it because it was just a practice in the field. And, in fact, at the meeting on the February meeting or the January meeting, the union rep who's there specifically says to Mr. Jandro, if you write it up as falsification of time, then Ms. Campbell's going to be terminated. So be careful about what you write it up because if you do write it up that way, she's going to get fired. Wasn't it clear that it was falsification of records? She admitted that she finished at, what was it, 2.30 or 3.30, and she clocked out an hour later. And, again, what we have . . . Well, between 2.30, which was when she did her last reading, and 3.30 when she would be off the clock, she did make time entries reporting what her activity was earlier in the day. And because she had . . . She entered the readings that she had made earlier. And entering the readings is part of the job. She had to do it sometime because he didn't give her the computer. He didn't give her the ITRON, exactly. So because she only had the laptop computer, which stayed in the vehicle, she couldn't enter the readings as she did them. So she wrote them down on a sheet of paper in order to enter them later. And when she entered them later, in that 2.30 to 3.15 time frame, that was still doing work during that period of time. And when she clocked out off of the computer, when she logged off of her laptop at 3.14, that was her last entry of the day. And again, that's . . . You know, if you look at . . . And we make the references in the record to her reports for other days. There were lots of other days where she clocked out of the computer at 3.15, 3.16. And they never claimed that she wasn't doing her job because she clocked out of the computer, you know, 14 minutes early or 15 minutes early, because her shift ended at 3.30. And Ms. Canfield, in her declaration, says she thought Ms. Campbell was one of the hardest working employees at National Fuel. So, I mean, again, this gets to this question of, over the course of a shift, this practice of bagging where employees did work earlier in the day, but then reported on their timesheet as being work done later in the day in order to fill their day because they were more efficient earlier. What is not allowed about that? Since she did the work, she took the readings earlier, right? And then she's allowed to spend time entering them, too, correct? Correct. What is inappropriate? I don't think there's anything inappropriate about that. I mean, it's not directly accurate in terms of that she did the work. She just didn't necessarily do it at the exact time that she reported it into the computer. I want to go back to the computer after each reading, which seems inefficient to me, but I don't know. When Mr. Jandro gave her the assignment for the day, and this is the only time Mr. Jandro had ever given an assignment like this to give a book of meter reads to a service person, she asked him, well, can I have an ITRON? And he said, no. Well, how do you want me to make these entries? How do you want me to do this? I don't care. Just get it done. You'll figure it out. So I would contend that that gave her the discretion in terms of how to go about her day. I do want to speak to the level of evidence, and I think it's important in the finding of pretext, that obviously the inconsistencies and contradictions within the record are important evidence in terms of undercutting the legitimate non-exclamatory reasons. So here, the fact that Mr. Jandro said he was looking for Ms. Campbell because he had paperwork to show her, but yet in the full time between the date in question until the date of her termination, he never presented her with the paperwork that was so important that he needed to go out into the field to find her rather than waiting until she came back that day. The accusations that he made in terms of where he allegedly observed her between 2.30 and 3 o'clock are inconsistent with the Heinrich Declaration. They're inconsistent with the plaintiff's characterization of her time. He had told her previously that she could stop at her mother's house, which again suggests that he had given her permission to deviate from her course over the course of the day, and yet when she stopped by for five minutes after she had gone to him and said, my mother's been diagnosed with cancer. Is it okay if I stop by periodically just to check on her? And he said it was fine. And now after the fact, he's saying that that was a problem. She didn't admit to falsifying her records, and she didn't deny making the stops. She's the one who volunteered that she stopped at Tim Horton's. She's the one who volunteered that she stopped at Office Max, and he only interrupted her to say, oh, but you also stopped at your mother's and your own home before she had an opportunity to disclose that. She never had any reason to hide the fact that she was making these stops because her understanding of the way that the employees did these jobs in the field was that they had that kind of discretion to do that, so she would have no reason to hide that. All right, anyway, right? Pardon me? The computer kept a watch on her. Well, the computer keeps a watch on her, but the computer, it's important to note that the computer reports when she makes entries into the system. It's not reporting her throughout the day. So to say that her last entry in the system was at a particular time doesn't mean that that's when she finished work. The record shows that she only did half or less than half of the readings that she was assigned. Is there anything about whether that's unusual? I mean, when people are assigned 78, do they usually do 78? Is there anything in the record about that? Mr. Jandro said that, you know, meter readers could be more efficient than that and that he would have expected her to accomplish more reads than that. However, again, Ms. Campbell — Well, is there anything in the record to show that 38 out of 78 was, you know, within the range of normal? I don't think there's anything directly in the record on that, but I think what's important is that a meter reader had that route the day before and so therefore had attempted to make those reads the day before, and these were the reads that the reader had been unable to make. So the fact is that if the day before meter readers had been unable to make those reads— Why they couldn't make them? It's not in the record. Well, it appears she only visited 38 of the 78, so that's different from showing up and not being able to read. In other words, she only got to less than half. Well, but she also had other service calls. So she had a service call in the morning that she had to make as a service member,  I'm just trying to get a handle on whether we draw anything from the fact that she only did half. I think that this was make work, essentially, because they weren't that busy, and so he said, here, here's a meter reading route to do. Get whatever you can get done done. I don't think there was an expectation that she would get a lot done, but again, we have here an employee that was described by Ms. Canfield as being the hardest working employee that she had ever supervised at National Fuel. Thank you, Counselor. You're reserved two minutes for rebuttal. We'll hear from National Fuel Gas. Good morning, Your Honors. I'm Melinda DeSere from Bond, Shenick & King, representing National Fuel Gas Distribution Corporation. Counsel, I find it ironic that this defendant was accused of theft of time, and Mr. Jandro followed her around for a whole day, and they can afford to pay for that. Mr. Jandro did not follow her around the entire day, Your Honor. Oh, just part of the day? He didn't steal any time. No, he's the supervisor. He attempted to contact her to get her to sign some papers. When she did not return the phone call, he checked the GPS. The GPS said that she was at a Tim Hortons. Tim Hortons was not part of her route. So he then went to the Tim Hortons. I understand that they used the public bathrooms at places like Tim Hortons. Everyone knew that. So he went to the Tim Hortons to find her. She was gone by then. The next time he caught up with her, she was at her home. And then he followed her around. He was looking for her to sign some papers that day.  We don't expect our employees to go from Tim Hortons to OfficeMax, to their house, to their mother's house, and then claim that they were working and get paid for working. That is not what a utility company expects their employees to do. And then to turn in a timesheet where she has manipulated the lunch hour because she specifically overrode the computer sheet to show that her lunch hour was 30 minutes when, in fact, it was close to 40, I believe. An extra 10 minutes for lunch. She didn't get disciplined for going over the lunch. She got disciplined for falsifying and manipulating the timesheet to make it look like she was working when, in fact, she wasn't. So she was taking time away. She was falsifying her timesheet. What was the manipulation of the timesheets? Just explain that, please. Sure. There's a computer sheet in the record, and she testified she'd never seen it before. But it noted that she went on break at 11.18. Her timesheet, where she knows she can override, she input 11.25 is the time when she started her lunch break. Then the computer sheet shows that she was en route again at noon. She overrode that and put on the computer sheet that she left at 11.55. That is because they're entitled to a 30-minute lunch. So she manipulated that. Plus, her timesheet that she turned in showed that she was working until 3.30, when, in fact, she testified that she had finished doing any meter reads at 2.30. Wasn't she entitled to the time to enter those meter reads into the computer? Yes, and the entry of those meter reads we have in affidavit would have taken less than five minutes. So she would have had plenty of time to take on the additional meter reads that were part of the record. Also, I want to point out that under the cat's paw theory, you need to establish that Mr. Jandreau had some discriminatory intent in order to take it back to the question before us. She was very clear that her indication that he had some discriminatory intent was based on just a feeling. He had never said or done anything that made her think that there was discriminatory intent. I also- The two male comparators, he treated them much better than he treated her. No. The two people who were also accused of theft of time, or use of a personal phone, or doing personal business reported by a utility consumer on the utility's time. None of those people resulted in a report being written that would lead to their termination. All of those people were reported, Your Honor. Every single one of them. In fact, I would like to make sure that you are aware there is not one identified person in this record, notwithstanding what Mr. Sanders said, not one identified person in this record that Mr. Jandreau knew about engaging in similar activity and did not report it up. Mr. Hasek called Mr. Jandreau after he cashed one check. He made one stop. He called Mr. Jandreau. He self-reported. He did not falsify any document. Mr. Jandreau reported that up the chain of command. Keith Richards is the one that made the decision. He prepared the disciplinary note. His initials are on it. In the record is the e-mail where he and others up the chain of command are deciding exactly what discipline to impose. So in the brief- You have a lot of high-paid people who have to decide whether someone who stops a cash or paycheck should be disciplined. Correct? We vet it through a number of people. This is a union environment, and we have to make sure that what we are doing is consistent with the union environment. Mr. Hasek also had an automobile accident. Yes, and a number of people have automobile accidents. The plaintiffs had an automobile accident previously. Mr. Hasek reported it, didn't he? He self-reported. He called it in as soon as it happened. How could you not? He damaged the car. Does he get credit for self-reporting that I damaged the car? He got credit for self-reporting, yes. In any event, he was recommended for discipline by Jandro. He was- He was placed in the same process that Campbell was. Absolutely, Your Honor. It got reported up the chain of command in exactly the same manner. Does the record also have an individual, a woman by the name of Mee, who was not terminated, even though she was found of misused company property? Lori Mee. Okay, Lori Mee filed a false attestation. She filed a false attestation that she had used her phone solely for business purposes when, in fact, five of the phone calls were personal phone calls to and from her daughter. She also was found to have made an excessive number of personal calls to employees during work time. She was reported, and she received a written warning. So she received something less than even- A theft of time, which I understand is the key to a report that will include termination? It wasn't theft of time, but she had- But isn't that what got- But it was a form of theft, Your Honor, because- But isn't that what did Sharon Campbell in? The theft of time in the report, the way it was characterized? No, Your Honor, there were three things. There was theft of time, falsification and manipulation of the time sheet, and not being up front with her supervisor at the time. But if I could, just for a moment, the- I lost my train of thought there. Lori Mee. All of us missed it. So with regard to each one of them, Mr. Jandrau reported every single one of them up the chain of command. And in the plaintiff's brief, it says that it's their contention that the presentation to upper management was the discriminatory act. In fact, he reported King, Hasek, and me all up the chain of command. Wasn't her report harsher in the sense of talking about theft of time, which I understand is the ultimate crime when you work for National Fuel Gas? What about the theft of time that Mr. Hasek engaged in when he had to stop and report an accident? Did he get reported for theft of time for that? I remember what I was going to say. Lori Mee was theft because she didn't reimburse the company for those phone calls and was directed to reimburse. So there was a theft, not of time, but of money. Somewhat comparable, one might think. She only got the written warning. He did prepare the report. In his report, there's absolutely no recommendation. With regard to Lori, with regard to the plaintiff, she was previously caught by a member of the public going to her mother's house. In fact, it was only six or seven months prior. By a member of the public going to her mother's house, presumably drinking alcohol. Jan Drow handled that internally. There was no consequence. Same with Mr. King. There was no consequence with an uncorroborated report. The Tenth Circuit's been very clear about the fact that it's legitimate to make distinctions based on whether there's corroboration of the conduct or not. And whether the decision can be sustained or not. Here, Mr. Jan Drow reported every single person. There's not one person in this record identified that he knew about that he did not report up the chain of command. And there's not one bit of evidence that he was motivated by discriminatory intent whatsoever. Plus, Mr. Richard did his own independent investigation, including specifically interviewing the plaintiff herself. And the union that represents her also determined that determination was appropriate here. And that was with a female attorney. So under all these circumstances, we really believe the decisions below of the magistrate and of the judge should be upheld. I just want to correct. I don't think the union determined that it was appropriate. They determined that they would not succeed in arbitration, which is not the same. Thank you. Thank you. Mr. Sanders, you've reserved two minutes for rebuttal. Yes, thank you, Judge. When I was talking about the Caspar earlier, I did get sidetracked about the element of bias by Mr. Jan Drow that's required. And in addition to the fact that the similarly situated employees were treated differently, there is evidence on the record, and not just from Ms. Campbell, that Mr. Jan Drow treated her as being a lesser, that he excluded her, that he turned his back on her, that he ignored her, that he threw her work assignments to her. And that that was corroborated not just by Ms. Campbell's testimony, but also by Mr. Robaca. In comparison to male employees? Yeah. But did he report King, Hasek, and me? Did he file reports with his supervisors that they had violated company policy? It's a simple question. Yes. Yeah, yeah, yeah. And that was the other point I wanted to make on rebuttal. Me is very distinguishable. Me is a case involving a misuse of the company's cell phone with five telephone calls to or from her daughter, and alleged excessive phone calls to coworkers. So these weren't misuse of the phone to calling non-company employees. And, again, there's no accusation in that case of any theft of time. Well, Hasek's the person that you think is the most comparable. Hasek is, and King. And Hasek, what's odd about the Hasek conclusion below is that she finds him to be similarly situated for purposes of the prima facie case, but then she concluded that he was not similarly situated for purposes of the pretext analysis. But your theory is that Jan Drow loaded the dice to have her, you're using the cat's paw theory. You're not alleging that the person who actually made the decision discriminated against you. You're claiming that Jan Drow misrepresented things. But that's why I asked you, did Jan Drow, how is it that Jan Drow recommends Hasek for consideration for discipline and did the same thing with your client, and yet somehow that's loading the dice? Because what's different is that with respect to my client, he accuses her of not just straying, but the theft of time component. Did she admit that she had done that? What she admitted was that her entries did not exactly correspond to the time that she did the work because she couldn't. Because she didn't have the ITRON. She was given the discretion to do the work as she saw fit. And she had no reason to think that she would need to self-report the inaccuracy of the time. Was there something slanted about Jan Drow's report? I mean, I'm looking at it. I don't see anything that suggests it was particularly harsh. Was there something inaccurate about the report? Not the fact that it's inaccurate, but the fact that he makes that report with those three charges of theft of time, inaccurate time sheet, and falsification of a document. They were all true. They were all true, but yet other employees routinely did the same stuff. And Jan Drow would have known that. All the supervisors would have known that. You have to name those other employees to have comparators. But Hackick and King are both employees that were- And he reported Hasek. He did, but not in a way that would lead to his termination. And he wasn't terminated. No, I understand that, but that's not the decision Jan Drow made. Richards made those decisions. But the fact that he reported them and the way he reported them, he could have not reported them. And Hackick gets five days rather than a termination. I don't understand. I don't understand that. You say he didn't have to report them. He did. He did. So how did he slant it? He didn't have to. I mean, employees- I know he didn't have to, but he did. Right. And the fact that he did and that he did so in a way that makes- He did means that he treated Hasek and King the same as he treated your client. But his report on Hasek and King did not accuse those individuals of all the same violations. Well, because they didn't do the same things that your client did. I mean, he didn't accuse them of things they didn't do. He could only accuse them of things that they did. So in your complaint, do you identify that he accused Hasek and King of things that they didn't do, but that were lesser so that they wouldn't be disciplined? Mr. King- Statue theory? Yeah. And Mr. King was- He did. But yet a bus driver accused him of passing him- Passing the school bus when the flashers were on in a different location than where Mr. King was. So he falsified where he was. And this wasn't just a random member of the public. It was a bus driver who wouldn't have known about Mr. Hasek's vehicle number and Mr. King's vehicle number unless Mr. King was where the bus was. So there was some real corroboration of it. They had a GPS. They could have gone back and corroborated that,  And did that lead to a theft of time as well? Well, it would have been because he wasn't where he was supposed to be, so he wasn't doing his job. But yet he wasn't accused of all three of those violations, so Mr. King wasn't terminated. But when I look in your complaint, you're going to say that John Groh misreported what Hasek actually did and such that Hasek would not have been disciplined. Is that what I'm going to find in your complaint? I don't recall my- I don't think I will find that at all. I believe we allege that Mr. Jandro treated Ms. Campbell differentially based on what she did versus what other employees did. All right, fair enough. And Mr. Jandro would have been- Thank you. Thank you. Thank you both. We'll reserve decision.